UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

EMMANUEL SABRA,

      Plaintiff,                         Civil Action No.  17-11687

v.                                 HON. DENISE PAGE HOOD
                                     U.S. District Judge
                                     HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Emmanuel Sabra ("Plaintiff") brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Plaintiff's Motion for Summary Judgment [Dock. #15] be GRANTED to the extent that the case be remanded for further proceedings, and that Defendant's Motion for Summary Judgment [Dock. #16] be DENIED.

## I.  PROCEDURAL HISTORY

Plaintiff applied for SSI on July 15, 2014, alleging disability as of the same day (Tr. 113).  After the initial denial of benefits, Plaintiff requested an administrative hearing, held on January 26, 2016 in Livonia, Michigan (Tr. 29).  Administrative Law Judge ("ALJ") Richard L. Sasena presided.  Plaintiff, represented by Wesley Lamey, testified (Tr. 33-46), as did Vocational Expert ("VE") Melody Henry (Tr. 46-51).  On April 12, 2016, ALJ Sasena found Plaintiff not disabled (Tr. 13-24).  On April 5, 2017, the Appeals Council declined to review the administrative opinion (Tr. 1-3).  Plaintiff filed for judicial review of the final decision on May 30, 2017.

## II.  BACKGROUND FACTS

Plaintiff, born April 19, 1995, was just short of his 21st birthday at the time of the ALJ's decision (Tr. 24, 113).  His application states that he completed 11th grade and never worked (Tr. 150-151).   His application alleges disability due to Attention Deficit Hyperactivity Disorder ("ADHD") and a learning disorder (Tr. 150).

### A.  Plaintiff's Testimony

*Plaintiff's counsel prefaced his client's testimony by noting that Plaintiff received a verbal IQ score of 70 and had been diagnosed with ADHD* (Tr. 33).

Plaintiff then offered the following testimony:

He worked previously as a restaurant dishwasher but had not worked since September, 2013 (Tr. 33-34).  During the work stint, he worked approximately six hours a day four days a week (Tr. 34).  He quit because the job entailed "too much lifting" and "too much running back and forth" (Tr. 34-35).  He had not looked for work since quitting the dishwashing position (Tr. 35).  He was unable to perform a job requiring lifting of more than 10 pounds (Tr. 35).  Before quitting, he had explained to his manager that he experienced back, shoulder, and neck pain (Tr. 35).  A skull injury sustained several years earlier caused hot flashes, dizziness, and a reduced attention span (Tr. 36).  Plaintiff took Adderall for the condition of ADHD but the medication did not work "that well" (Tr. 36).  He experienced the side effects of appetite loss and insomnia from Adderall (Tr. 36).

Plaintiff lived with his mother in a single family home (Tr. 37).  His mother was currently looking for work (Tr. 37).  He had health insurance coverage at the time of the hearing (Tr. 37).  He dropped out of school after completing 10th grade but had recently received a GED (Tr. 38).  He stopped school after 10th grade due to his failure to attend class and "acting up" (Tr. 39).  Plaintiff experienced difficulty interacting with other employees while working as a dishwasher because they "ma[d]e [him] do all the work" (Tr. 39).  He was yelled at and "written up" for not taking out the garbage even after he told his supervisors of his physical limitations (Tr. 39).  Due to ADHD, he also experienced problems focusing at work (Tr. 40).

During his school years, he was placed exclusively in special education classes (Tr. 40). He was unable to live on his own due to "pain" and his inability to care for a house (Tr. 40). His personal problems were exacerbated by the recent birth of his child (Tr. 41). He relied on his girlfriend to care for the child, opining that he was unable to take care of both himself and the child (Tr. 41). He visited his child twice a week at the house of his girlfriend's mother (Tr. 44). His girlfriend had taught him how to interact with the baby but he did not perform any childcare chores (Tr. 44-45).

Plaintiff had been told by a physical therapist to stretch twice a day and avoid lifting over 25 pounds (Tr. 41). Plaintiff's exercise was limited to stretching upon arising and before retiring (Tr. 41). He was unable to sit for more than an hour or stand for more than 45 minutes (Tr. 42). He was unable to walk for a mile due to being bow-legged (Tr. 42). He was unable to lift more than 25 pounds (Tr. 42). He smoked around five cigarettes each day (Tr. 42-43). He did not drive (Tr. 42). He denied the use of alcohol or street drugs (Tr. 43). He was currently attending school four hours each day four days a week (Tr. 43). He enjoyed playing video games and surfing the internet (Tr. 43). His time with friends was spent playing video games and occasionally going to the mall (Tr. 43). He had numerous tattoos on his arms, back, and neck after a friend with a tattoo gun offered to do them without charge (Tr. 45).

-4-

Plaintiff regularly experienced level "9" out of 10 back, neck, and shoulder pain (Tr. 46). The body pain was exacerbated by cold and dampness (Tr. 46). He coped with the pain by using hot compresses and sleeping as much as possible (Tr. 46). Plaintiff attempted to obtain temporary job positions through Job Corps and had worked for a few hours on one occasion at Planet Fitness (Tr. 47-48). While Plaintiff smoked marijuana regularly while growing up, he stopped using altogether at the age of 18 while on probation for a conviction related to school activity (Tr. 48).

### B.   Medical Evidence

#### 1.  School Records and Treating Sources

May, 2011 school records show that Plaintiff was approved for Individualized Education Program ("IEP") in reading comprehension, written expression, and basic reading skills (Tr. 130). The records note that Plaintiff had 2nd grade reading comprehension skills and 3.5 grade skills in math calculation (Tr. 132). School records note that Plaintiff's academic progress was hampered by his belief that he did not require an education to obtain a job (Tr. 133-139).

In July, 2014, Nancy Akers, D.O. performed an initial evaluation for the condition of ADHD, noting reported symptoms of a short attention span, impulsive behavior, distractibility, fidgeting, and excessive talking (Tr. 231). She noted that Plaintiff was currently taking Adderall (Tr. 231). She prescribed ProAir for allergy-related respiratory symptoms (Tr. 233). In September, 2014, Plaintiff sought treatment for a sinus infection and

back pain (Tr. 224).  Treating records note Plaintiff's report of a history of a head injury, ADHD, and restless legs syndrome (Tr. 224-225).  Dr. Aker's records from the next month note that symptoms of ADHD had been stable (Tr. 355).  Plaintiff reported worsening symptoms when not taking Adderall (Tr. 355).

December, 2014 pain management records note Plaintiff's complaint of worsening back pain since sustaining injuries in a car accident at the age of nine (Tr. 270).  He exhibited full motor strength in all extremities (Tr. 272).  Physical therapy records from the same month note a diagnosis of lumbago (Tr. 307).  Plaintiff reported that his condition was exacerbated by "a new job in a factory" requiring him to stand for long periods (Tr. 318).  Plaintiff was discharged from therapy the following month after being seen for four visits, failing to show for two, and canceling another (Tr. 322).  Plaintiff reported that he was "very pleased with his progress" (Tr. 322).  He appeared alert and fully oriented (Tr. 322).

January, 2015 treating records note Plaintiff's report of chronic sinusitis (Tr. 251).  He reported smoking less than one pack of cigarettes a day (Tr. 251).  He appeared alert and not in acute distress (Tr. 252).  Plaintiff declined refills for back pain medication but requested a renewed prescription for physical therapy (Tr. 266).  Imaging studies of the lumbar spine were wholly unremarkable (Tr. 274, 300).  The following month, Plaintiff reported that he felt generally well with "minor complaints" (Tr. 254).  Treating records note a diagnosis of asthma (Tr. 347).  March, 2015 records note that Plaintiff was fully oriented with an appropriate mood and affect and a normal gait (Tr. 268).  April, 2015 records note

that surgery for a deviated nasal septum was performed without complications (Tr. 259-261, 369).

July, 2015 treating records state that Plaintiff was currently working as a landscaper and felt that a back brace would help him with "heavy lifting" (Tr. 335). He appeared fully oriented with a normal affect (Tr. 337). August, 2015 records note Plaintiff's report of continuing back pain with only temporary relief from physical therapy (Tr. 263). Plaintiff reported that he currently worked at Planet Fitness (Tr. 264). He appeared "active and alert" with full orientation and a normal gait (Tr. 265). Physical therapy records from the same month note Plaintiff's report of right shoulder pain (Tr. 279). He reported that he was currently working as a landscaper (Tr. 289). He reported "10" out of 10 pain sitting for more than 20 minutes and lifting greater than 50 pounds (Tr. 289). Plaintiff demonstrated a mildly reduced range of upper extremity motion (Tr. 291). He was discharged from physical therapy the following month for failing to show up after the initial visit (Tr. 294).

## 2.  Consultative and Non-Examining Sources

In February, 2013, Michael Matouk performed intelligence testing on behalf of the SSA under the direction of Terence Campbell, Ph.D. (Tr. 201-202). He noted the report of Plaintiff's mother that Plaintiff had trouble focusing and in reading (Tr. 201). Matouk noted a slightly flat affect with "slight poverty of speech and content" (Tr. 202). Matouk noted that Plaintiff was possibly "grossly inattentive" or had "a low interest and corresponding low effort when attempting to answer the questions" (Tr. 202). Matouk noted that the test results

"may represent tentative estimates of his current level of functioning" (Tr. 202). Plaintiff scored a full scale IQ of 78, a verbal IQ of 70, a perceptual organizational index of 88, working memory index of 75, and processing speed index of 84 (Tr. 202).

Matouk noted a possible verbal learning disability but "no indication of a cognitive deficit" (Tr. 203). He noted that Plaintiff's "somewhat sullen affective state" could have contributed to his scores (Tr. 203). Matouk recommended "employment opportunities in vocational capacities that adequately developed nonverbal abilities" (Tr. 203). He assigned Plaintiff a GAF of 54 due to depressive and learning disorders[1] (Tr. 204). He found that Plaintiff could "have difficulty with the conscientious management of his benefits" (Tr. 204).

In December, 2013, Firoza B. VanHorn, Psy.D. performed a consultative psychological examination on behalf of the SSA, noting that Plaintiff was appropriately dressed and had a normal gait (Tr. 206). Plaintiff reported that he was unable to cook, stay at home, or perform chores without his mother's supervision (Tr. 206). He reported that he had been suspended from school several times for "'yelling at teachers'" (Tr. 206). Plaintiff noted that his physical health was good (Tr. 207). He denied having friends and noted that he was expelled from school the previous year for fighting with a security guard (Tr. 207). He reported that he spent the day watching television and listening to music (Tr. 208).

---

[1]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM–IV–TR*"), 34.

Dr. VanHorn noted that Plaintiff was socially appropriate with a good immediate and remote memory, normal affect, and good judgment (Tr. 208-209). He could spell "world" forward but not backwards (Tr. 208). She concluded that although Plaintiff was intellectually limited, he could "function on a daily basis and care for himself" (Tr. 209). She noted a "symbiotic relationship between [Plaintiff] and his mother who has convinced him he is incapacitated" (Tr. 209). She assigned Plaintiff a GAF of 68[2] (Tr. 209). She found Plaintiff's prognosis "hopeful as long as he is motivated to change his lifestyle" (Tr. 210).

In October, 2014, Dawn Bane Gventer, Psy.D. performed a consultative psychological assessment on behalf of the SSA, noting Plaintiff's report that he was applying for disability because he was unable to focus and had "an attitude problem" and did "not take responsibility" (Tr. 245). Plaintiff admitted to working as a landscaper for the past two months for eight to ten hours a day but quit recently due to back and shoulder pain (Tr. 245). He reported that he was in special education while in school (Tr. 246). He reported that he did his own cooking and laundry (Tr. 246). He appeared well dressed and groomed (Tr. 246). Dr. Gventer noted fluent speech and a normal affect (Tr. 246-247). Dr. Gventer diagnosed Plaintiff with ADHD, noting that he was capable of handling his benefit funds (Tr. 247). She noted "slightly impaired memory and concentration" and limited judgment (Tr. 248). She noted no functional restrictions (Tr. 248).

---

[2]GAF scores in the range of 61 to 70 suggest "some mild symptoms or some difficulty in social, occupational, or school functioning." *DSM–IV–TR* at 34.

The same month, Jerry Csokasy, Ph.D. performed a non-examining assessment of the treating and consultative records on behalf of the SSA, finding that due to organic mental disorders, Plaintiff experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 57-58).  Dr. Csokasy noted that Plaintiff scored a full-scale IQ of 78 in February, 2013 but was observed to be "not fully engaged in the exam, nor was he motivated" (Tr. 58).  He noted that Plaintiff's claim that he was unable to go outside stood at odds with his acknowledgment that he was able to take public transportation (Tr. 58).

### C.    Vocational Expert Testimony

The ALJ posed the following set of limitations to VE Henry, describing a hypothetical individual of Plaintiff's age, education, and lack of work background:

> [L]imited to light work with occasional climbing, balancing, stooping, kneeling, crouching and crawling; limited to simple, routine, repetitive tasks; requires little judgment . . . short period of time; with no interaction with the general public; could have occasional interaction with co-workers, general proximity, but not as a team member[3] (Tr. 49).

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

The VE responded that the hypothetical individual could perform the light, unskilled job of a hand packer (75,000 positions in the national economy); assembler (80,000); and inspector (62,000) (Tr. 49-50).  The VE testified that the need to change position every 30 minutes would reduce the hand packer and assembler positions but would not affect the inspector position (Tr. 50).  The VE testified that if the hypothetical individual were further limited by the need to avoid concentrated exposure to vibrating tools, the assembler position would be eliminated but the other two positions would be unaffected (Tr. 50).

The VE testified that if the above-described individual were limited to sedentary rather than light work, he would be able to perform the work of a sedentary sorter/packer (68,000); visual inspector (78,000); and machine tender (65,000) (Tr. 51).  The VE stated that her testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") except for the testimony regarding a sit/stand option which was based on her own professional experience (Tr. 51).

### D.  The ALJ's Decision

At Step One of the administrative analysis, the ALJ found that "[a]bsent any evidence to the contrary," Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability date (Tr. 15).  Next, citing the medical records, ALJ Sasena found that Plaintiff experienced the severe impairments of "lumbago; [ADHD]; learning disorder; and dysthymic disorder " but that none of the conditions met or medically equaled impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-16).  He found that Plaintiff

experienced mild limitation in activities of daily living and social functioning and moderate limitation in concentration, persistence, or pace (Tr. 16-17).  The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for a limited range of light work with the following additional limitations:

> [C]laimant can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds.  He can stand/walk for six hours total out of an eight-hour workday and sit for six hours total out of an eight-hour workday, with a 30-minute sit/stand option.  Additionally, the claimant can occasionally climb, balance, stoop, kneel, crouch, and crawl.  He must avoid concentrated exposure to vibrating tools.  Moreover, the claimant is limited to simple, routine, and repetitive tasks (requires little judgment, can be learned in a short period).  He can have no interaction with the general public.  Finally, the claimant can have occasional interaction with coworkers (not as a team member) (Tr. 18).

Citing the VE's findings, the ALJ found that Plaintiff could work as a  hand packer and inspector (Tr. 24, 50).

The ALJ discounted Plaintiff's allegations of limitation, noting that the objective medical evidence and  "numerous activities of daily living" stood at odds with the disability claim (Tr. 23).  He noted that Plaintiff's regular activities included "performing landscaping work, using public transportation, walking, playing video games, vacuuming, watching television, swimming, [and] grooming activities" (Tr. 23).  The ALJ cited consultative records showing that Plaintiff spoke clearly and was socially appropriate with a good memory, thought process, and mood (Tr. 21-22).

### III.  STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir. 1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.  FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V. ANALYSIS

In his sole argument for remand, Plaintiff contends that he is entitled to a finding of disability at Step Three of the sequential analysis due to an intellectual disability. *Plaintiff's Brief,* 7-13, *Docket # 15,* Pg ID 423. Plaintiff relies on February, 2013 intelligence testing showing a verbal IQ of 70 in support of his argument that he meets the version of Listing 12.05(C) in effect at the time of the determination. *Id.* at 10.

At Step Three of the administrative sequence, "[a] Claimant who meets the requirements of a Listed Impairment will be deemed conclusively disabled [] and entitled to benefits." *Reynolds v. Commissioner of Social Security,* 424 Fed.Appx. 411, 414, 2011 WL 1228165, *2 (6th Cir. April 1, 2011); 20 C.F.R. §§ 404.1520(a)(4)(iii). "Listing of

Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.'" *Id.* (citing 20 C.F.R. § 404.1525(a)).

Plaintiff contends that he is disabled under the version of Listing 12.05 in existence at the time of the ALJ's determination which requires a threshold finding of "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22." Under subsection (C) of the same version of Listing 12.05, he must also show "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function . . . ."

Plaintiff hinges his 12.05(C) argument (requiring a full scale IQ of 60 to 70) on February, 2013 IQ testing showing a verbal IQ of 70 (Tr. 202). In response, Defendant notes that the February, 2013 intelligence testing on behalf of the SSA, along with other evidence was considered but rejected by the SSA in reviewing Plaintiff's earlier October 15, 2012 application for childhood benefits. *Defendant's Brief* at 11, *Docket #16,* Pg ID 444. Defendant notes that since the denial of the October 15, 2012 application, Plaintiff applied for benefits again on November 5, 2013 and was denied on January 8, 2014. *Id.* (*citing* Tr. 54). Defendant notes that consideration of the February, 2013 evidence of disability in

determining whether Plaintiff was disabled beginning on July 15, 2014 is thus barred by *res judicata. Id.* at 12 (*citing Drummond v. CSS,* 126 F. 3d 837, 841 (6th Cir. 1997)).

After his prior claims were denied at the initial level, Plaintiff did not request a hearing before an ALJ.  Thus, the past non-disability decisions were based only on initial determinations.  Courts in this district have recognized "tension . . . in the case law addressing whether *res judicata* applies to pre-hearing determinations."  *Bailey v. Commissioner of Social Security*, 2018 Wl 3284449, at *7 (E.D. Mich. March 26, 2018)(Morris, M.J.).  "[I]t is not altogether clear that the doctrine of *res judicata* even applies" to an earlier, "initial determination" of non-disability.  *Johnson v. Commissioner of Social Security* 2015 WL 730094, at *3, fn 2,  (E.D.Mich. February 19, 2015)(Friedman, J.)(same);  *Rogers v. Commissioner of Social Security*, 2000 WL 799332, at *5 (6th Cir. June 9, 2000)(*citing Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise* § 13.3, pp. 248-54 (3d ed. 1994)(while at the agency level "a trial-type hearing" with findings of law and fact, "the reasons for treating its decision as *res judicata* are the same as the reasons for applying *res judicata* to a decision of a court," but when "the formality . . . sufficiently diminished the administrative decision may not be *res judicata*").

The question of whether *res judicata* applies is somewhat peripheral to whether the February, 2013 test results should be considered in conjunction with the current application. Plaintiff, alleging disability as of July 15, 2014, does not seek to reopen the earlier, denied applications, but rather, argues that the February, 2013 intelligence testing should be

-16-

considered in determining whether he currently meets Listing 12.05.  Aside from the relative lack of guidance regarding whether the doctrine of *res judicata* applies to initial determinations, the February, 2013 intelligence testing was properly considered in the current application for benefits.  The threshold requirements for disability under Listing 12.05 require a finding of  "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment *before age 22*." (Emphasis added). The intelligence testing, performed when Plaintiff was 17, would  be arguably relevant not only to the current application for benefits, but possible future claims where he would be required to establish (among other things) intellectual deficiencies first manifested during the developmental period. Second, in the current determination, the ALJ acknowledged and cited the February, 2013 findings in support of the non-disability finding, noting that score reflected "tentative estimates" of Plaintiff's actual level of functioning (Tr. 21).

While the ALJ properly considered the February, 2013 records in conjunction with the current application, the Court must determine whether his failure to cite or discuss Listing 12.05 at Step Three constitutes reversible error.  As an initial matter, the Court notes that the transcript contains some support for the finding that Plaintiff did not meet Listing 12.05(C). While Plaintiff also contends that the school records satisfy the Listing's threshold requirement of "significantly subaverage general intellectual functioning," a review of the

-17-

school records shows that Plaintiff qualified for IEP in only reading comprehension, written expression, and basic reading skills (Tr. 130).   Even assuming that Plaintiff's verbal impairments qualified as significantly subaverage intellectual functioning, the record contains support for the finding that he did not meet the "adaptive functioning" requirement of Listing 12.05 for which the claimant must show deficiencies in two or more of the following areas: "communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Hayes v. Commissioner of Social Security*, 357 Fed.Appx. 672, 677, (6th Cir. 2009)(*citing DSM–IV–TR* at 49).   While the school records indicate that Plaintiff lacked academic skills, the record shows that he was able to communicate with ease, perform grooming chores, interact with friends, sustain a romantic relationship, take public transportation, seek and obtain work for at least a few months at a time, and did not pose a threat to himself or others.

As to Plaintiff's argument that the verbal IQ score of 70 met subsection (C) of 12.05, Matouk noted that  the scores reflected only "tentative estimates" of Plaintiff's actual level of functioning (Tr. 202).   He cited Matouk's finding that Plaintiff's functioning was in the "low average range" with a verbal learning disability and an affective disorder (Tr. 21, 203). Matouk explicitly found no evidence of a cognitive deficit (Tr. 203), noting that Plaintiff's low scores were possibly attributable to his "sullen affective state" (Tr. 203).   The ALJ accorded "great weight" to Matouk's interpretation of the test scores and conclusion that

Plaintiff would be able to perform work relying heavily on his non-verbal abilities (Tr. 22). Matouk's evaluation is consistent with subsequent psychological evaluations showing that Plaintiff did not experience cognitive or memory difficulties and had a "hopeful prognosis so long as he was motivated to change his lifestyle" (Tr. 210). None of the treating, consultative, or non-examining sources opined that Plaintiff met Listing 12.05. The Court notes gross inconsistencies between Plaintiff's professed physical and mental limitations and the other evidence of record.

Despite the record evidence supporting a finding that Plaintiff did not meet Listing 12.05(C), the ALJ's failure to mention, much less provide an explanation of why Plaintiff did not meet the Listing requires a remand for explanation and clarification. While Plaintiff's application for benefits alleged disability due only to ADHD and a learning disorder (Tr. 150), Plaintiff, through counsel, submitted pre-hearing briefs on January 22 and June 27, 2016 arguing that he met both the threshold and subsection (C) requirements of Listing 12.05(C) (Tr. 194-195, 198-199). Counsel reiterated the 12.05(C) argument at the beginning of the oral hearing (Tr. 33). At a minimum, Plaintiff has made a cogent argument that he has demonstrated "significantly subaverage general intellectual functioning," deficits in adaptive functioning in at least two areas, and one IQ score between 60 and 70.

Because Plaintiff has pointed to some evidence in support of the finding that he meets all of the requirements of Listing 12.05(C), it would be improper to conclude that the ALJ would have made a non-disability finding at Step Three even if he had considered the

applicable listing.    It is the ALJ's job, not the Court's, to weigh the evidence.  "The "substantial evidence" standard, according to which a district court reviews decisions by the Commissioner, does not permit the court to resolve conflicts in evidence." *DeLong v. Commissioner of Social Security*, 748 F.3d 723, 726 (6th Cir. 2014)(*citing Ulman v. Commissioner of Social Security*, 693 F.3d 709, 713 (6th Cir.2012)).

As such, a remand for articulation of why Plaintiff does not meet the Listing is required.   A remand for an analysis of whether he meets the listing "is not merely a formalistic matter of procedure, for it is possible that the evidence [he] put forth could meet this listing." *Reynolds,* 424 Fed.Appx. at 416 (*citing Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir.1996))("In short, the ALJ need[s] to actually evaluate the evidence, compare it to [the applicable Listing], and give an explained conclusion, in order to facilitate meaningful judicial review. Without it, it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence").    The Court notes once again that the ALJ found that the February, 2013 test scores in question did not reflect Plaintiff's actual capabilities (Tr. 21).  However, the ALJ's failure to even cite Listing 12.05, much less provide a rationale for finding that Plaintiff did not meet or medically equal it, requires a remand for clarification.

I note in closing that while the ALJ's failure to discuss Listing 12.05(C) requires a remand for clarification, a remand for an award of benefits on this record is not warranted. An award of benefits is appropriate "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. HHS*,

17 F.3d 171, 176 (6th Cir. 1994).

## VI.  CONCLUSION

For the reasons stated above, I recommend that Plaintiff's Motion for Summary Judgment [Dock. #15] be GRANTED to the extent that the case be remanded for further proceedings, and that Defendant's Motion for Summary Judgment [Dock. #16] be DENIED.

Any objections to this  Report and Recommendation must be filed  within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


Dated: July 12, 2018                          s/R. Steven Whalen
                                              R. STEVEN WHALEN
                                              UNITED STATES MAGISTRATE
                                              JUDGE


## CERTIFICATE OF SERVICE

I hereby certify on July 12, 2018 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on July 12, 2018.


                                              s/Carolyn M. Ciesla
                                              Case Manager for the
                                              Honorable R. Steven Whalen